**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 11-cv-03407-MSK-KMT

**JAY HARRISON,**

      **Plaintiff,**

**v.**

**THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LARIMER,**
**COLORADO;**
**LARIMER COUNTY, COLORADO SHERIFF'S DEPARTMENT;**
**SHERIFF JUSTIN SMITH, individually and in his official capacity;**
**UNDERSHERIFF WILLIAM NELSON, individually and in his official capacity,**

      **Defendants.**

_____

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
_____

      **THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment **(# 41)**, Mr. Harrison's response **(# 44)**, and the Defendants' reply **(# 47)**;

and the Defendants' Objections **(# 49)** to the Magistrate Judge's February 8, 2013

Recommendation **(# 48)** that the Defendants' Motion to Dismiss **(# 17)** be granted in part and

denied in part.

## FACTS

      The Court provides a summary of the pertinent undisputed facts, and elaborates as

necessary in the analysis.  Where there is a dispute, the facts are construed most favorably to the

non-movant.

1

Mr. Harrison was employed as a Deputy with the the Larimer County Sheriff's Office.  In 2010, Mr. Harrison decided to stand for election to the open position of Sheriff of Larimer County, as did his co-worker, Mr. Smith.  One of Mr. Harrison's major campaign themes addressed inefficiencies, improper priorities, and a purported lack of integrity at the Sheriff's Office.  Mr. Harrison believed these accusations implicated Mr. Smith, who was a member of the existing command structure.

On November 2, 2010, Mr. Smith won the election.   Shortly thereafter and consistent with Mr. Harrison's campaign promise to resign from the Sheriff's Department if not elected, he told Mr. Smith that he intended to begin looking for other work.

A few days later, while still employed by the Sheriff's Department, Mr. Harrison contacted the Mayor of the Town of Wellington.  Mr. Harrison proposed to "discuss law enforcement in Wellington."  The Town of Wellington did not have its own police department, but instead had a contract with the Larimer County Sheriff's Department to provide law enforcement services.  Mr. Harrison intended to inquire of the Mayor whether the Town was interested in starting its own police department, suggesting that a town-run police department "can save the town money and provide better service."   It does not appear that the Mayor and Mr. Harrison had any particular substantive discussions on the issue, insofar as the Mayor suggested that the matter needed to be addressed to the Town Council.

Mr. Harrison and other Sheriff's Department deputies interested in the issue of a Wellington police department attended a late December 2010 meeting of the Wellington Town Council.  Mr. Harrison asked to address the Council on the issue, but his request was denied as untimely.  Instead, the Council put Mr. Harrison on the agenda for its next meeting, January 11,

2011.  Circumstances prevented Mr. Harrison from attending the January 11 meeting so Deputy

Tim Strohl made the presentation.  Mr. Harrison followed up with an e-mail to the Mayor,

referring to Mr. Strohl's presentation and again suggesting that the town create a police force.

He proposed that the Town "start the department with hiring Larimer Sheriff's Deputies to save

costs and time in training people."  Ultimately, the Town decided not to create a police force.

Mr. Smith obtained a recording of the January 11 Town Council meeting.  Believing that

the statements made by Mr. Strohl about the Sheriff's Department contract and service were

"disloyal" to the Sheriff's Department, Mr. Smith initiated an investigation into Mr. Harrison and

Mr. Strohl's role in the presentation.  Sergeant Disner conducted the investigation on behalf of

the Sheriff's Department and interviewed Mr. Harrison on February 2.  The Defendants contend

that, during this interview, Mr. Harrison made representations to Mr. Disner that were

inconsistent with the contents of his e-mails to the Wellington Mayor - in particular that: (i) Mr.

Harrison never identified himself as a Larimer County Sheriff's Deputy, but Mr. Harrison's e-

mail to the Mayor states "I am currently a Deputy with the Sheriff's Office"; (ii)  Mr. Harrison

denied that he ever represented that he wanted to start a police department in Wellington; and

(iii) Mr. Harrison denied stating that he wanted to be a member of any police department formed

in Wellington.  Mr. Harrison disputes that he made any false statements to Mr. Disner.  He

contends that: (i) he denied having made a representation to the Mayor that he was a Larimer

County Sheriff's Deputy, pointing out that his e-mail never identified the "Sheriff's Office"

where he was a deputy; and (ii) with regard to Mr. Disner's questions about other representations

he might have made to the Mayor, Mr. Harrison stated that he was unsure of precisely what his

e-mails said until he could have an opportunity to review them.

3

On March 18, 2011, following the investigation, Defendant Nelson, as Undersheriff, formally notified Mr. Harrison that his employment as a Deputy was being terminated. The notice of termination accused Mr. Harrison of misconduct and disloyalty. Specifically, it explained:

> The investigation was centered around your actions with fellow Deputy Tim Strohl in contacting the town of Wellington about starting their own police department. . . In e-mails and town board agendas, you were identified and was listed as a Larimer County Deputy Sheriff who wanted to talk about law enforcement in Wellington. You advise that you did not represent yourself as a representative of the Sheriff's Office, but by your emails and actions contradict your statements. You further make statements in your e-mails that the Sheriff's Office "does a good job [but] it can be done better." You further state that "We would build a professional law enforcement agency that has only the interest of the town and its citizens in mind."
>
> I further believed that you are not being completely truthful about your involvement and intent. Your statements say one thing but your e-mails say the contrary.

The letter went on to recite prior discipline imposed on Mr. Harrison between 2006 and early 2011, as well as reciting Mr. Nelson's review of Mr. Harrison's "evaluation and performance log" which revealed "several references to your lack of self-initiated activity and case investigation/classification." Mr. Nelson concluded by stating "You conduct is intolerable and raises questions about your future truthfulness, integrity, and your ability to do the job. . . [Y]our actions cannot be excused or justified."

Mr. Harrison appealed his termination to a Hearing Board. On April 14, 2011, the Hearing Board upheld Mr. Harrison's termination, finding his conduct to have violated Sheriff's Office rules governing "standard of conduct" and loyalty, as well as an additional charge of

"untruthfulness" that, the Hearing Board acknowledged, was not listed in the termination letter but was consistent with the allegations contained therein.  On April 28, 2011, Mr. Smith, acting as Sheriff, finalized the termination of Mr. Harrison's employment.

Mr. Harrison then commenced this action.  In the Second Amended Complaint **(# 12)** (but limited in accordance with the Magistrate Judge's Recommendation that certain claims be dismissed, to which Mr. Harrison has filed no timely objections), Mr. Harrison asserts two claims for relief: (i) a claim under 42 U.S.C. § 1983, that his termination constituted impermissible retaliation for exercise of his free speech rights guaranteed by the First Amendment to the United States Constitution; (ii) a claim under 42 U.S.C. § 1983, that his termination constituted impermissible retaliation against him for his exercise of associational rights guaranteed by the First Amendment.

The Defendants seek summary judgment **(# 41)** on Mr. Harrison's claims.  In addition, they object **(# 49)** to a portion of the Magistrate Judge's Recommendation **(# 48)** regarding the designation of the proper entity to be named as Defendant in this action.

## ANALYSIS

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party

5

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  See Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a prima facie claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

6

### B.  First Amendment speech claim

When the government is acting in its capacity as employer, rather than its capacity as sovereign, it enjoys a broader ability to regulate the speech and conduct of employees than it would have in regulating speech or conduct by private citizens.  *See generally Waters v. Churchill,* 511 U.S. 661, 671-72 (1994) ("the government as employer indeed has far broader powers than does the government as sovereign").  In attempting to strike a balance between the government's need (as an employer) to efficiently manage its workforce and the public worker's right (as a citizen) to invoke his or her First Amendment right to speak out on matters of public importance, the Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968), held that a public employee who speaks out on a matter of public concern enjoys the full protection of the First Amendment against retaliation in the employment sphere.  In *Connick v. Meyers,* 461 U.S. 138, 146-47 (1983), the Supreme Court explored the converse situation, concluding that where a public employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern . . . government officials should enjoy wide latitude in managing their offices," such that "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee.

Thus, the required elements of a First Amendment retaliation claim by a public employee, derived from *Pickering*, are as follows.  The employee must show:  (i) that he engaged in speech (or other First Amendment activity) that addressed a matter of public concern; (ii) that  his interest in free expression outweighed the employer's legitimate interest in restricting the speech; and (iii) that the speech was a substantial or motivating factor in the challenged

governmental action.  The burden then shifts to the employer to demonstrate  (iv) that it would have taken the same action even in the absence of the employee's protected speech. *Morris v. City of Colorado Springs*, 666 F.3d 654, 661 (10th Cir. 2012).  The first two elements – whether the speech addressed a "public concern" and the balancing of employer and employee interests – generally present issues of law to be decided by the Court; the last two elements – the employer's motivation and whether it would have made the same decision absent the speech – are generally matters of fact to be determined by the factfinder.  *Id.*

Here, Mr. Harrison engaged in two distinct strands of allegedly protected speech: speech during his campaign for Sheriff, and in his subsequent attempt to persuade the Town of Wellington to create its own police force.  The Court analyzes each type of speech separately.[1]

### 1. Campaign speeches

The Court begins by examining whether Mr. Harrison can demonstrate that the Defendants retaliated against him based on his campaign speeches.

#### a. contents of the speech

The Defendants contend first that Mr. Harrison cannot sufficiently identify any specific statements he made during the campaign that could even be examined to determine their level of First Amendment protection.  Rather, the Defendants contend that Mr. Harrison can only identify his campaign statements in vague terms of their subject matter.

The Court finds that the record contains enough examples of specific campaign statements by Mr. Harrison to permit analysis.  Among other things, the record includes what

---

[1]     It is not clear whether Mr. Harrison contends that the two strands of speech somehow combine to create an actionable claim where, as discussed below, neither strand of speech would support a claim of its own accord.  Ultimately, the Court finds that such a contention would be unavailing for reasons the Court addresses *infra.*

appears to be an October 2010 article about Mr. Harrison's campaign from a publication called

the "North Forty News."  That article refers to Mr. Harrison as stating:

> • That he would like to see other top administrators in the Sheriff's Office out on the streets, in uniform and in marked cars, as "they're paid very well . . . and they should be out there serving the public."

> • That the department is "top-heavy" and needed "restructuring," as "the number of administrators in the Sheriff's Office has more than doubled since . . . 1996, but only a few deputy positions have been added."

> • That the current administration's[2] solution to balancing the department's budget was "telling deputies to write more traffic tickets," which Mr. Harrison did not believe to be "in the public's best interest."

> • That the current administration was "a reactive office" that did not sufficiently stress crime prevention.

In addition, Mr. Harrison's brief contends that he "publicly question[ed] the integrity of

the command staff" in his campaign speeches.  The record offers only the vaguest suggestion of

the actual contents of such assertions: for example, Mr. Harrison mentions in his own deposition

that "my message was that the Sheriff's Office . . . didn't have the integrity and honor that I felt

it should have," but does not specify any particular examples of a lack of integrity that his

speeches might have addressed or otherwise elaborate on his assertions.  The Court will assume,

for purposes of this analysis, that Mr. Harrison made only generalized statements challenging the

"integrity" of the Sheriff's Office (or suggesting that he would bring "more integrity" to the

office), but did not purport to bring any particular instances of alleged dishonest or corrupt

behavior by the Sheriff's Office to the public's attention.

---

[2] The article specifically implied that Mr. Smith was considered, at least by Mr. Harrison, to be associated with the current Sheriff's Office administration.  The article quotes Mr. Harrison as stating "Justin Smith has had an opportunity for several years to make effective changes [and] nothing will change with Mr. Smith [as Sheriff]."

b.  whether the speech addressed "public concern"

A matter is one of public concern where it relates to "any matter of political, social, or other concern to the community"; that notion is juxtaposed with an action that is "only of personal interest" to the employee.  *Connick*, 461 U.S. at 146-47.  This assessment must be made "by the content, form, and context" of the activity in question.  *Id.* at 147-48.   Matters of public concern are those that are "subject[s] of legitimate news interest; that is a subject of general interest and of value and concern to the public."  *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004).

The Court may consider the motive of the actor in an attempt to determine whether the association was "calculated to redress personal grievances or whether it had a broader public purpose," such as "sufficiently inform[ing] the issue as to be helpful to the public in evaluating the conduct of government."  *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996); *see also Craven v. Univ. of Colorado Hosp. Auth.*, 260 F.3d 1218, 1226-27 (10th Cir. 2001) ("[i]n deciding whether a particular statement involves a matter of public concern, the fundamental inquiry is whether the plaintiff speaks as an employee or as a citizen"), *Morris v. City of Colorado Springs*, 666 F.3d 654, 662-63 (10th Cir. 2012) (manner in which employee "frames" the statement is relevant in determining whether he speaks as citizen or employee).  Thus, "speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern," whereas "speech that seeks to expose improper operations of the government or questions the integrity of governmental officials" does.  *Id.*

The Defendants do not particularly argue that Mr. Harrison's campaign statements and positions do not reflect matters of "public concern" – indeed, it is difficult to imagine how bona

fide campaign speeches could be other than of public concern.  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1205 (10th Cir. 2007) ("political speech regarding a public election is undoubtedly a matter of public concern").  Instead, the Defendants focus on matters touching on "internal management decisions" or "budgetary allocations" contending that they do not amount to matters of "public concern."

The Defendants rely on *Gardetto v. Mason*, 100 F.3d 803, 813-14 (10th Cir. 1996), but it is more supportive of Mr. Harrison's position. In *Gardetto*, the speech at issue was a university professor's comments about a lack of objectivity in a proposed layoff plan.  The Court found that such comments were of public concern, insofar as "the speech of persons able to offer a well-informed perspective on expenditures of public funds may be especially valuable to public debate on such subjects." *Id.* at 814.  In similar vein, the efficiency or effectiveness of the organization or operation of a Sheriff's office, or the value it receives for its expenditures of public funds, are certainly matters of public concern. Accordingly, the Court finds that Mr. Harrison's campaign speech involved matters of "public concern."

### c.  employer's interest in regulating the speech

The next element requires the Court to weigh the employer's interest in restricting the speech against the employee's interest in speaking out.  The question is whether the employer "has an efficiency interest which would justify it in restricting the particular speech at issue." *Brammer*, 492 F.3d at 1207.  The Court inquires whether the employee's exercise of speech rights "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the

enterprise."[3] *Hulen v. Yates*, 322 F.3d 1229, 1238 (10th Cir. 2003).  However, "the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, <u>by the speech itself</u>, of the public employer's <u>internal</u> operations and employment relationships." *Brammer*, 492 F.3d at 1207 (emphasis in original).  The employer's interest element cannot be satisfied by "purely speculative allegations that certain statements caused or will cause disruption." *Dill,* 155 F.3d at 1203.  Rather, an employer's interest is triggered by "actual disruption of services which results" from the speech.  *Finn v. New Mexico*, 249 F.3d 1241, 1248-49 (10th Cir. 2001); *but see Hulen v. Yates,* 322 F.3d 1229, 1238-39 (10th Cir. 2003) (suggesting that, in some circumstance, "a governmental employer may rely upon predictions of disruption if supported by evidence").

        The Defendants have not offered a specific argument on this point as it relates to Mr. Harrison's campaign speech.  They do not, for example, contend that Mr. Harrison's campaign speeches about the Sheriff's Office being "top-heavy," his comments about the office's priorities, or his contention that the office lacked integrity (or that he could bring more integrity to it) had any particular disruptive effects on the staff.  Even assuming it did, the Court has grave doubts that the employer's interests in preventing such disruption would overcome the strong interest that Mr. Harrison (and the public) would have in ensuring that those matters were adequately explored in the election of a new Sheriff.

        Accordingly, the Court finds that Mr. Harrison's campaign comments enjoyed full First Amendment protection under the *Pickering* balancing.

----

[3]        The employer's interest is "particularly acute in the context of law enforcement, where there is a heightened interest in maintaining discipline and harmony among employees."  *Dill v. City of Edmond*, 155 F.3d 1193, 1203 (10th Cir. 1998).

d.  employer's motivation

The Court then turns to the question of whether Mr. Harrison can show that his campaign comments were a motivating factor in the Defendants' decision to terminate his employment.  As noted above, this element involves a question of fact that is normally reserved for the factfinder, but as with all factual questions, summary judgment may be appropriate if Mr. Harrison cannot demonstrate a genuine issue of triable fact.

The 10th Circuit has noted that "protected conduct closely followed by adverse action may justify an inference of retaliatory motive," particularly where "the protected speech implicated the individual defendant in wrongdoing."  *Baca v. Sklar*, 398 F.3d 1210, 1221 (10th Cir. 2005).  Taken in the light most favorable to Mr. Harrison, the record indicates that he made various complaints about the organization and operations of the Sheriff's Office through the election season of 2010, culminating in the election in early November.  Those criticisms included statements inferring that Mr. Smith was complicit in establishing and maintaining the unfavorable policies.  However, Mr. Harrison testified that he ceased making such comments after the election was over.

Mr. Smith initiated the investigation that led to Mr. Harrison's termination on January 11, 2011.  Thus, the temporal window with regard to Mr. Harrison's campaign speech is 70 days, or 10 weeks.  The 10th Circuit has been extremely reluctant to permit an inference of retaliatory motivation to be drawn where the temporal distance between protected conduct and adverse action approaches that length.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (six week window is sufficient to permit inference, but three month window is too long).  Indeed, in *Meiners v. University of Kansas.*, 359 F.3d 1222, 1231 (10th Cir. 2004), the

13

court suggested, without necessarily finding, that events occurring at least "two months and one week [67 days], and a maximum of just under three months" apart are "probably too far apart . . . to establish causation by temporal proximity alone."[4]

Given the length of time between Mr. Harrison's campaign speeches and the commencement of the investigation that led to his termination, the Court is inclined to find that the distance is too great to permit an inference from temporal proximity alone that the Defendants acted with an improper motivation. Thus, the burden is on Mr. Harrison to come forward with additional evidence that indicates that the Defendants harbored a retaliatory motive against him.

The only additional argument Mr. Harrison offers in support of his contention that the Defendants were motivated by his protected conduct is that there are certain discrepancies between the investigation report prepared by Mr. Disner and the reasons articulated by Mr. Nelson and Mr. Smith in their termination letters, or inconsistencies with the termination letters themselves. The Court finds this argument to be insufficient.

Mr. Harrison argues, for example, that the Defendants accuse him of lying during Mr. Disner's investigation, but points out that Mr. Disner's investigation report "makes no mention of an untruthful statement by [Mr.] Harrison." But Mr. Harrison concedes that Mr. Disner's report "mention[s] perceived contradictions" between Mr. Harrison's interview statements and

---

[4]      Arguably, Mr. Harrison might gain some additional probative value from the fact that his campaign comments implicated Mr. Smith alongside the existing Sheriff's Office management. Speech directly implicating an individual defendant in wrongdoing gains a bit of additional potency when examining a causal connection. *Baca v. Sklar*, 398 F.3d 1210, 1221 (10th Cir. 2005). But the Court finds that, given Mr. Harrison's single reference to Mr. Smith being a part of the existing administration implicates Mr. Smith in Mr. Harrison's criticisms in a largely indirect way, reducing any probative effect of causation that could be found.

the contents of his e-mails to the Town of Wellington, suggesting that there is some material difference between an "untruthful statement" and a "perceived contradiction."  It is evident from Mr. Disner's report that he believed Mr. Harrison was being untruthful (or at the very least, misleading) about the extent of his involvement in the Wellington issue, and thus, there is no apparent inconsistency between the facts recited in Mr. Disner's report and Mr. Smith's ultimate conclusion that Mr. Harrison should be terminated for, among other things, untruthfulness.

Ultimately, the Court finds that Mr. Harrison has not come forward with evidence that would permit the factfinder to draw an inference between his campaign speeches and the decision to terminate him.  Instead the evidence strongly rebuts such an inference.  Mr. Harrison's first act, upon losing the election, was to inform Mr. Smith that he would soon be resigning from the Sheriff's Department.  Mr. Harrison articulates no reason why Mr. Smith, even if he harbored animus against Mr. Harrison for comments made on the campaign trail, would not simply allow that resignation to occur.  Moreover, it is clear that the Wellington matter constitutes an entirely independent intervening event that would dispel any inference that the Defendants' actions against Mr. Harrison sprang from his campaign speeches, rather than his conduct in the Wellington matter.  Any inference of causation that one might draw between Mr. Harrison's campaign speeches and his termination is effectively displaced by more direct inference of causation represented by the Wellington issue.

One might argue that the Defendants silently nursed a post-election grudge against Mr. Harrison, such that they availed themselves of an opportunity to investigate him for the Wellington matter where they would have ignored such activity by another Sheriff's Office employee who had not campaigned against Mr. Smith, but even this argument is problematic for

15

both factual and theoretical issues.  Factually, the record refutes any contention that Mr. Harrison was treated more harshly than similarly-situated individuals who did not make such campaign statements.  The record shows that Mr. Disner also recommended that Deputy Strohl be found guilty of the same conduct violations even though there is no indication that Deputy Strohl ever campaigned against Mr. Smith or made comments similar to Mr. Harrison's campaign statements.  In addition, the facts of the Wellington matter are totally independent of the election.

Accordingly, because the Court finds that Mr. Harrison cannot establish that his campaign speeches were a motivating factor in the Defendants' decision to terminate him, the Defendants are entitled to summary judgment on the portion of Mr. Harrison's First Amendment speech claim based on campaign statements.

### 2. Wellington incident

The analysis proceeds differently with regard to the Wellington matter.

#### a. contents of speech

The Court begins by examining the particular speech that Mr. Harrison engaged in.  For the most part, Mr. Harrison's communications with the Town of Wellington are contained in e-mails he sent to the Mayor; it appears to be undisputed that he personally had no substantive oral conversations with Town officials.  Thus, the Court examines the e-mails.

The initial e-mail to the Mayor, dated November 12, 2010, states simply: "My name is Jay Harrison.  I am currently a Deputy with the Sheriff's Office.  Would you have time to meet with me to discuss law enforcement in Wellington."  On November 23, 2010, Mr. Harrison again wrote to the Mayor, stating:

> I was wondering if you had a chance yet to look at your calendar to
> see if you had a small amount of time to meet.  I would like to

> discuss what your thoughts might be on Wellington starting their
> own Police Department.  I have looked at some numbers which
> include size of the town, call load, and effective service.  I believe
> we can start a Police Department which can save the town money
> and provide better service.  With officers living in town and being
> a part of the community.  There are several Deputies including
> myself that live in town and would love to serve our home
> community.  We would build a professional law enforcement
> agency that has only the interest of the town and its citizens in
> mind.

The record does not address any particular comments Mr. Harrison might have made at

the December Town Council meeting.  It appears that he requested leave to address the Town

Council, but was told that his subject was not on the agenda and he was too late for general

public comments, but was offered the opportunity to be placed on the agenda for the next

meeting.  He wrote to the Mayor again shortly before the January 11, 2011 Town Council

meeting, in which he states that he will not be able to attend, but adds:

> We have prepared some information for the board.  Wellington has
> been my home for over 9 years.  I enjoy raising my kids and living
> here as do so many of us.  We are not wanting to say bad things
> about the Sheriff's Office.  There are great Deputies that work in
> Wellington.  Although the Sheriff's Office does a good job, it can
> be done better.

Finally, on January 13, 2011, he wrote:

> I hope the Strohls did well with the presentation.  I am meeting
> with Chief Wagner from Timnath tomorrow.  She is providing me
> with information on starting a police dept.  I am also working with
> the towns of Nunn and Pierce in reference to giving info on
> starting a police agency.  I would like to submit a proposal to
> Wellington to start a police dept.  I am looking to start the
> department with hiring Larimer Sheriff's Deputies to save costs
> and time in training people.  These Deputies live or would live in
> Wellington because of the increased commitment to the town they
> live in as well as reducing the response time to calls and call outs
> from on call time.  Again, I think we can reduce costs and improve
> effective law enforcement in town.  This is a change for the people

to have a great influence on the law enforcement they want for the
town.

The record reflects no further communications by Mr. Harrison with the Mayor or anyone else in

the Town of Wellington.

b. whether the speech addressed "public concern"

Mr. Harrison's comments to the Mayor appear to be a mix of public and private concerns.

Arguably, he raises matters that touch on questions of public concern, including the possibility

that Wellington could obtain cost savings and reduction in call times by establishing a town

police department.  These are clearly matters that any citizen of Wellington would be expected to

be interested in.  However, Mr. Harrison does not discuss these issues in any particular detail,

other than to simply suggest that, in the abstract, cost savings and reduced call times could be

obtained.

At the same time, Mr. Harrison also raises issues that are quite clearly statements bearing

only on his own pecuniary interests, such as expressing his desire to "serve [his] home

community" – in other words, to get a job with the new town police department -- and the

implication in the January 13 e-mail that Mr. Harrison saw himself as consulting on ("I am

working with the towns of Nunn and Pierce [and Timnath] . . . on starting a police agency") or

heading up ("I am looking to start the department with hiring Larimer Sheriff's Deputies . . .")

Wellington's new police department.  These are purely private concerns that do not receive any

particular protection.

The fact that a body of speech touches on elements of both private and public concern

does not cast the entire course of speech into one category or the other; rather, it merely affects

the weight to be given in the *Pickering* balancing to the employee's interest in making the

speech. *Finn*, 249 F.3d at 1248-49 ("although not excluded from protection by the first step of

the *Pickering* analysis, a body of speech with only a 'tidbit' of content touching on matters of

public concern often will not be entitled to protection under the second step"). Thus, Mr.

Harrison's comments to the Mayor of Wellington enjoy some, but less than full, protection in the

*Pickering* balancing.

c. <u>employer's interest in regulating the speech</u>

The Court then turns to the relative weight to be given to Mr. Harrison's limited public

interest in advocating for Wellington to start a police department and the Defendants' interest, as

employer, in preventing disruption that might result from Mr. Harrison's speech.

The Defendants offer two major arguments as to why Mr. Harrison's statements were

particularly disruptive. First, they point out that Mr. Harrison specifically proposed poaching

deputies from the Sheriff's Department to staff a new Wellington police department. The

Defendants point out that such conduct would necessarily result in increased costs to the

Sheriff's Department, both in terms of lost investments in time and training for the deputies who

left and in the need to recruit and train new deputies. Second, the Defendants point to concrete

evidence of disruption that occurred from Mr. Harrison's speech, as Mr. Smith testified that the

Sheriff's Office deputies who were currently working in Wellington felt slighted by Mr.

Harrison's comments that the Sheriff's Office was providing inferior quality services, resulting

in what Mr. Smith described as "a morale issue for them."

Both of the interests articulated by the Defendants are genuine and significant. Few

employers would abide a current employee actively and overtly soliciting the employer's

customers to defect and join a competing business (much less one that the employee himself was

19

proposing to form).  And even fewer employers would tolerate that employee expressly

proposing to recruit the staff for his or her new venture from the employer's current personnel.

The Court is comfortable in finding that no reasonable factfinder could conclude that the

Sheriff's Office's interest in ridding itself of a current employee actively fostering the departure

of both employees and customers of his employer (much less for his own direct pecuniary

benefit), clearly outweighs the minimal public interest Mr. Harrison had as a citizen of

Wellington proposing ways for the town to save money.

Of course, Mr. Harrison's proposal was not accepted by Wellington, and thus, the

Sheriff's Office suffered no <u>actual</u> loss of customers or staff.   The Court notes that caselaw

contemplates that, in certain circumstances, employers can act to prevent disruption before it

occurs.  *Hulen*, 322 F.3d at 1238-39. The particulars of the Wellington issue would certainly be

an appropriate invocation of that rule.

But even if the Court were limited to balancing <u>actual</u> disruption against Mr. Harrison's

public concerns, the record reflects that the Sheriff's Office suffered actual disruption as a result

of Mr. Harrison's proposal to Wellington in at least two ways.  First, as Mr. Smith testified, he

personally "heard the chatter around the office from the deputies" that were insulted by Mr.

Harrison's suggestion that their services to Wellington were insufficient.[5]  This disruption of

personal working relationships and confidence among co-workers is the type of injury to

---

[5]      Mr. Harrison argues that Mr. Smith's deposition testimony only recites hearsay that Mr. Smith obtained from Deputy Noe about damage to staff morale.  But Mr. Smith's deposition makes clear that his understanding of morale problems caused by Mr. Harrison's proposal was based both "from what I heard [from] Deputy Noe . . . as well as just the noise I heard, the chatter around the office from the deputies."  In any event, the fact that Mr. Smith may have received reports of morale problems through intermediary officers, rather than directly from the complaining deputies themselves, matters little in the question of whether an employer had an interest in quelling the morale problem.

operations that can permit employers to act.  Moreover, the record also reflects that the Sheriff's Office (justifiably) felt the need to conduct an investigation into the nature, extent, and contents of Mr. Harrison's contacts with Wellington in order to ascertain how Mr. Harrison's statements could affect the Sheriff's Office.  This diversion of resources to matters outside the normal scope of the Sheriff's Office's regular operations is another form of disruption that weighs in favor of permitting the Defendants to act.

Accordingly, the Court finds that, taking the facts in the light most favorable to Mr. Harrison, the *Pickering* balancing resolves, as a matter of law, in favor of the Defendants with regard to Mr. Harrison's statements to the Town of Wellington.  The Defendants' decision to terminate Mr. Harrison as a result of those comments does not implicate Mr. Harrison's First Amendment speech rights, and thus, the Defendants are entitled to summary judgment on Mr. Harrison's speech-based § 1983 claim in its entirety.

### C.  First amendment association claim

Mr. Harrison's also invokes the First Amendment's guarantee of freedom of association, contending that the Defendants retaliated against him for associating with others when advocating for the Wellington proposal.

As the Court understands it, this claim arises from the fact that Mr. Harrison discussed his proposal with others, such as Deputy Strohl, before presenting it to the Town of Wellington, and that Deputy Strohl ultimately gave the presentation to the Town Council when Mr. Harrison could not attend.

In consideration a claim for retaliation based on an employee's exercise of associational rights under the First Amendment, the Court first determines the nature of the clamed association

21

– whether it is "intrinsic" or "instrumental" association. *Merrifield v. Board of County Commissioners*, 654 F.3d 1073, 1080 (10th Cir. 2011). Where, as here, the association is undertaken for the purpose of engaging in other First Amendment conduct (such as speech petitioning the Wellington Town Council to make a certain decision), the association is "instrumental" in nature. Claims of "instrumental" association are analyzed according to the First Amendment conduct the associational conduct promotes. *Id*. at 1083.

Because the Court has already concluded that Mr. Harrison's speech-based conduct with regard to the Wellington issue failed to survive the *Pickering* balancing, it is difficult to see how a claim that he was retaliated against for associating with Mr. Strohl and others to engage in that conduct would somehow survive. Mr. Strohl's presentation to the Wellington Town Council avoids some of the pitfalls of Mr. Harrison's communications with the Mayor, in that Mr. Strohl's comments do not emphasize poaching employees from the Sheriff's Office to staff a town police force, nor emphasized Mr. Strohl or Mr. Harrison's intention to be considered for employment with a new police force. Arguably, then, Mr. Strohl's speech makes a stronger case for being considered to be on a matter of public concern than Mr. Harrison's speech does. But the distinction is largely insignificant, as the Court has already found that Mr. Harrison's own speech-based conduct fails the *Pickering* balancing. Associating with others who were more moderated and temperate in their speech does little to afford protection when one's own speech-based conduct lacked protection under *Pickering*.[6]

---

[6]  In any event, the Court finds that Mr. Harrison would have difficulty establishing the remaining elements of a claim based on his association with Mr. Strohl and others, for most of the reasons discussed above with regard to his speech-based claims. An employee who seeks to undermine his employer is no less disruptive – and indeed, is <u>more</u> disruptive – because he conspired with other co-workers to assist in the effort.

Accordingly, the Court finds the Defendants are entitled to summary judgment on Mr. Harrison's associational § 1983 claim as well.

### D.  Remaining matters

The foregoing reasoning suffices to grant summary judgment to the Defendants on both of Mr. Harrison's § 1983 claims premised on the First Amendment.  Mr. Harrison also asserted a § 1983 claim sounding in deprivation of due process, but the Magistrate Judge recommended that the due process claim be dismissed.  Mr. Harrison did not file timely objections to the recommendation, and the Court, having nevertheless reviewed the recommendation under the otherwise applicable *de novo* standard of review, agrees with the Magistrate Judge's reasoning and conclusions.  Thus, Mr. Harrison's due process claim is dismissed for failure to state a claim.

The Defendants filed timely objections to a portion of the recommendation regarding who should be the appropriate entity Defendant in this case – the Board of County Commissioners or the Sheriff's Office itself.  Because the Court grants summary judgment to all Defendants on all of Mr. Harrison's claims, it is unnecessary to reach the question of which entity is a proper Defendant going forward.  Accordingly, the Defendants' objections to the Magistrate Judge's recommendation are overruled as moot.

### CONCLUSION

For the foregoing reasons, the Court ADOPTS that portion of the Magistrate Judge's February 8, 2013 Recommendation **(# 48)** relating to Mr. Harrison's due process claim.  The Defendants' Motion to Dismiss **(# 17)** is GRANTED with regard to that claim and that claim is DISMISSED for failure to state a claim.  The Defendants' Objections **(# 49)** to other portions of the Recommendation are OVERRULED AS MOOT.  The Defendants' Motion for Summary

23

Judgment **(# 41)** is GRANTED in its entirety.  The Clerk of the Court shall enter judgment in favor of the Defendants and against Mr. Harrison in this matter, and shall thereafter close the case.

Dated this 12th day of March, 2013.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge

24